# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **BILLY JAMES BISHOP, JR.,** | ) | |
| Plaintiff | ) | |
| v. | ) | Civil Action No. 2:16cv00029 |
| | ) | **MEMORANDUM OPINION** |
| **NANCY A. BERRYHILL,**[1] | ) | |
| **Acting Commissioner of** | ) | |
| **Social Security,** | ) | |
| Defendant | ) | By: PAMELA MEADE SARGENT |
| | ) | United States Magistrate Judge |

## I. Background and Standard of Review

Plaintiff, Billy James Bishop, Jr., ("Bishop"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying his claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423 and 1381 *et seq.* (West 2011 & West 2012). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge upon transfer by consent of the parties pursuant to 28 U.S.C. § 636(c)(1). Neither party has requested oral argument; therefore, this case is ripe for decision.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

---

[1] Nancy A. Berryhill became the Acting Commissioner of Social Security on January 23, 2017. Berryhill is substituted for Carolyn W. Colvin, the previous Acting Commissioner of Social Security.

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Bishop protectively filed his applications for DIB and SSI on March 29, 2012, alleging disability as of December 10, 2011, due to post-traumatic stress disorder, ("PTSD"); anxiety; panic attacks; problems with the sciatic nerve in his right leg; back pain; hepatitis C; and dermatitis herpetiformis.[2] (Record, ("R."), at 218-25, 240, 244, 287, 305.) The claims were denied initially and on reconsideration. (R. at 114-16, 120-22, 125-27, 131-33, 136, 138-40, 142-47, 149-51.) Bishop then requested a hearing before an administrative law judge, ("ALJ"). (R. at 152-53.) A video hearing was on October 2, 2015, at which Bishop was represented by counsel. (R. at 43-71.)

By decision dated October 27, 2015, the ALJ again denied Bishop's claims. (R. at 23-35.) The ALJ found that Bishop met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2012. (R. at 25.) The ALJ found that Bishop had not engaged in substantial gainful activity since December 10, 2011, the alleged onset date. (R. at 25.) The ALJ found that the medical evidence established that Bishop had severe impairments, namely hepatitis C; dermatitis herpetiformis; hypertension; depression; and anxiety, but he found that Bishop did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P,

---

[2] Dermatitis herpetiformis is a chronic disease of the skin marked by severe itching and the extensive eruption of vesicles and groups of papules. It is also called Duhring's disease. *See* STEDMAN'S MEDICAL DICTIONARY, ("Stedman's"), 221 (1995).

Appendix 1. (R. at 25-26.) The ALJ found that Bishop had the residual functional capacity to perform simple, routine, unskilled medium[3] work that allowed regularly scheduled breaks; that did not require him to perform food handling or preparation pre-consumption; that did not require him to work around hazardous machinery, unprotected heights and climbing of ladders, ropes or scaffolds; that did not have strict production rate or pace requirements; and that did not require more than occasional interaction with the public, co-workers and supervisors. (R. at 27-28.) The ALJ found that Bishop was unable to perform his past relevant work. (R. at 33.) Based on Bishop's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that a significant number of other jobs existed in the national economy that Bishop could perform, including jobs as a night cleaner, a garment folder, a hospital cleaner and a hand packer. (R. at 33-34.) Thus, the ALJ concluded that Bishop was not under a disability as defined by the Act, and was not eligible for DIB or SSI benefits. (R. at 34-35.) *See* 20 C.F.R. §§ 404.1520(g) 416.920(g) (2017).

After the ALJ issued his decision, Bishop pursued his administrative appeals, (R. at 16), but the Appeals Council denied his request for review. (R. at 1-5.) Bishop then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2017). This case is before this court on the Commissioner's motion for summary judgment filed April 24, 2017.[4]

---

[3] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting or carrying of items weighing up to 25 pounds. If an individual can do medium work, he also can do sedentary and light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2017).

[4] Bishop did not file a motion for summary judgment, but on March 23, 2017, he filed a Memorandum Brief In Support Of Plaintiff's Claim For Social Security Disability Benefits. (Docket Item No. 16).

Bishop was born in 1981, (R. at 218, 220), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education and some college course work. (R. at 52.) Bishop has past relevant work as a cook, a general laborer and a tile installer. (R. at 49, 52-54, 251.) He stated that he took Paxil for depression and anxiety. (R. at 54.) Bishop stated that he took Subutex. (R. at 54.) He stated that he had used marijuana for a couple of years because "it helps my nerves and calm[s] [me] down from my anxiety attacks…." (R. at 56.) Bishop stated that his skin condition, a gluten-type allergy, would flare up two weeks out of the month. (R. at 58.) He stated that, when these flare-ups occur, he itches all over, which causes him to scratch and bleed. (R. at 59.) Bishop stated that his medication for the allergy helped, but he still continued to break out. (R. at 59-60.)

Asheley Wells, a vocational expert, was present and testified at Bishop's hearing. (R. at 67-70.) Wells was asked to consider a hypothetical individual of Bishop's age, education and work history, who could perform simple, unskilled medium work that did not require him to handle food or anything pre-consumption; that did not require him to work around hazardous machinery, unprotected heights or climbing of ladders, ropes or scaffolds; who would require regularly scheduled breaks every two hours; who could not work with a strict production rate or pace requirement; and who would not be required to have more than occasional interaction with the public, co-workers or supervisors. (R. at 67-68.) She stated that the individual could not perform any of Bishop's past work, but that other jobs existed in significant numbers that the individual could perform,

including jobs as a night cleaner and a garment folder, both at the light[5] exertion level, and jobs as a hospital cleaner and hand packager, both at the medium exertion level. (R. at 69.) Wells stated that there would be no jobs available should the individual miss four or more days of work a month. (R. at 69.) She also stated that there would be no jobs available if the individual was unable to maintain attention and concentration for extended periods, to understand and remember short and simple instructions, to complete a normal workweek without interruptions, to perform at a consistent pace without extended breaks and to get along with co-workers or peers. (R. at 70.)

In rendering his decision, the ALJ reviewed records from Dr. Carolina Bacani-Longa, M.D., a state agency physician; Dr. Jack Hutcheson, M.D., a state agency physician; Dr. Kevin Blackwell, D.O.; Dr. Art Van Zee, M.D.; and Dr. Russell D. Mader, M.D.

The record shows, that at age 16, Bishop started snorting Percocet and Lortab; at age 18, he began snorting and injecting OxyContin; he then injected opioids for roughly 10 years, with OxyContin being his drug of choice; and at age 21, he was using IV heroin before switching back to OxyContin. (R. at 429.) In 2004, Bishop went to prison for forged checks, where he was drug-free until his release in July 2006. (R. at 429.) He relapsed three weeks after his release from prison and continued to abuse drugs until July 2008, when he entered a buprenorphine treatment program. (R. at 429-30.) He was initially placed on Suboxone. (R. at 431.)

---

[5] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2017).

The record shows that Dr. Art Van Zee, M.D., treated Bishop from April 2009 through July 2015. Dr. Van Zee diagnosed opioid type dependence; nondependent tobacco use disorder; hepatitis C; mixed or unspecified drug abuse; leg pain; probable lumbar radiculopathy; depression; anxiety, acute gastroenteritis; dermatitis herpetiformis; nocturnal leg cramps; and plantar warts. (R. at 351, 353, 356, 359, 362, 365, 371, 373, 376, 378-79, 393, 396, 398, 405, 407, 410, 417, 419, 421, 426-27, 431, 433, 435, 472, 475-77, 479, 481-94, 497, 501, 504, 508, 512, 516, 519, 527, 530, 534, 538, 542, 546, 550, 553, 556, 559, 562, 565, 568, 571, 574, 578, 581, 585, 589, 595, 603-04, 638-39, 641-42, 646, 650-51, 654-55, 658-59, 662-63, 666-67, 670-71, 674-75, 679.)

On April 1, 2009, Dr. Van Zee reported that Bishop had been referred to him from the Addiction Education Center for entry into the buprenorphine treatment program. (R. at 429.) On July 2, 2009, Bishop reported that he had taken a "few Klonopin" that someone had given him. (R. at 478.) When Dr. Van Zee observed that Bishop had needle marks, he admitted to recently injecting Ritalin. (R. at 478.) Bishop went to jail from September 9, 2009, through October 5, 2009, because he violated his probation; a urine drug screen was positive for benzodiazepines. (R. at 487.) In December 2009, Bishop requested consideration for reentry into the buprenorphine treatment program. (R. at 487.) On July 24, 2011, x-rays of Bishop's cervical spine showed mild spondylosis, and an x-ray of Bishop's thoracic spine showed nominal scoliosis and spondylosis. (R. at 443, 445.)

On January 10, 2012, Bishop complained of nausea, vomiting and diarrhea, as well as a rash on his elbows, buttocks and legs. (R. at 576.) He stated that he had missed work the previous day and asked for a work excuse. (R. at 576, 578.). Dr. Van Zee completed a work excuse indicating that Bishop could return to work on

January 11, 2012.[6] (R. at 578.) Bishop continued to complain of a rash at visits in February and March 2012. (R. at 579, 583.) On May 22, 2012, Bishop reported that he had stopped working due to increased depression and leg pain, but stated that the main reason he stopped working was because of right leg pain. (R. at 428.) Dr. Van Zee performed a physical examination which revealed that Bishop's reflexes were 2+ and equal. (R. at 427.) He was able to walk on his toes and heels, and a straight leg raising test was negative on the left at 75 degrees and positive on the right at 60 degrees. (R. at 427.) X-rays of Bishop's right knee and lumbosacral spine were normal. (R. at 442.) On July 3, 2012, Dr. Van Zee saw Bishop for follow-up care, at which time he reported that he was still somewhat reclusive at home. (R. at 597.) He also reported that he had applied for a job and was applying for other jobs. (R. at 597.) On September 11, 2012, Dr. Van Zee noted that Bishop's depression had improved with medication. (R. at 435.) Bishop once again reported that he had not been able to find work. (R. at 435.) Diagnoses included dermatitis herpetiformis; depression, improved; and opioid dependence. (R. at 435.)

On November 20, 2012, Dr. Van Zee wrote a reference letter for Bishop for employment purposes.[7] (R. at 421.) The record shows that throughout 2012 and 2013 Bishop reported that he was doing well and that his symptoms of anxiety and dermatitis herpetiformis had improved with medication. (R. at 358, 361, 420, 433, 435, 579, 587, 601, 604.) In addition, the record shows that throughout 2012 and 2013 Bishop routinely reported that he was searching for employment. (R. at 358, 361, 364, 372, 399, 420, 433, 435, 597.) The record shows that Dr. Van Zee

---

[6] The work excuse is not contained in the record; however, it is referenced in Dr. Van Zee's treatment notes. (R. at 578.)

[7] The reference letter is not contained in the record; however, it is referenced in Dr. Van Zee's treatment notes. (R. at 421.)

continued to follow Bishop for opioid dependence through July 2013. (R. at 350-425.) During his treatment, Bishop's drug screens were negative, except for tetrahydrocannabinol, ("THC"). (R. at 351, 354, 356, 360, 363, 371, 376, 379, 393, 398, 407, 410, 417, 422, 473, 564, 609, 642, 647, 650, 656, 659, 663, 667, 671, 675, 679.) Dr. Van Zee repeatedly advised Bishop that he needed to be completely abstinent of THC if he was to remain in buprenorphine treatment. (R. at 638, 641, 646, 651, 655, 658, 662, 666.)

On July 1, 2014, Dr. Van Zee completed a mental assessment,[8] indicating that Bishop had moderate[9] difficulty in his ability to carry out very short and simple instructions; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; to sustain an ordinary routine without special supervision; to ask simple questions or request assistance; to accept instructions and respond appropriately to criticism from supervisors; to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; to respond appropriately to changes in the work setting; to be aware of normal hazards and take appropriate precautions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans independently of others. (R. at 623-25.) He opined that Bishop had marked[10] limitations in his ability to remember locations and work-like procedures; to understand and remember very short and simple instructions; to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to work in coordination with or in proximity to

---

[8] Dr. Van Zee stated that he had treated Bishop since 2008 and that Bishop has had the limitations found in his mental assessment since 2000, but that Bishop's symptoms had worsened within the past two to three years. (R. at 629.)

[9] Moderate is defined as having the ability to perform satisfactorily, but not always. (R. at 623.)

[10] Marked is defined as a serious limitation resulting in unsatisfactory performance. (R. at 623.)

others without being distracted by them; to make simple work-related decisions; to complete a normal workday without interruptions from psychologically based symptoms; to complete a normal workweek without interruptions from psychologically based symptoms; to perform at a consistent pace with a standard number and length of rest periods; to interact appropriately with the general public; and to get along with co-workers or peers without distracting them or exhibiting behavioral extremes. (R. at 623-24.) He found that Bishop would be absent from work more than four days a month. (R. at 624.) Dr. Van Zee based these limitations on his finding that Bishop had a "very significant chronic anxiety disorder," which substantially impaired his ability to work around individuals and co-workers. (R. at 625.)

That same day, Dr. Van Zee completed a medical assessment, indicating that Bishop's most limiting symptoms were a result of anxiety and "almost agoraphobia." (R. at 632-33.) He opined that these symptoms were severe enough to frequently interfere with the attention and concentration required to perform simple work-related tasks. (R. at 632.) Dr. Van Zee found that Bishop could walk a "few blocks" without interruption; sit and stand a total of four hours in an eight-hour workday and that he could do so for up to 30 minutes without interruption; that he would require an unscheduled break "every few hours" for up to 15 minutes per break; frequently lift and carry items weighing up to 10 pounds; occasionally lift and carry items weighing up to 50 pounds; and that he would be absent from work more than four days per month. (R. at 632-33.) He opined that Bishop was not physically capable of working an eight-hour workday five days a week on a sustained basis. (R. at 633.)

In August 2014, Dr. Van Zee saw Bishop for complaints of pressure in the back of his head (R. at 677.) Bishop stated that his mother was ill and that he was

more depressed. (R. at 677.) He reported that he was taking Paxil and Buspar. (R. at 677.) Dr. Van Zee noted that Bishop was scheduled to undergo psychological testing in two weeks. (R. at 677.) A drug screen was positive for THC. (R. at 679.) In September 2014, Dr. Van Zee noted that Bishop had postponed his psychological testing. (R. at 673.) Dr. Van Zee continued to see Bishop through July 2015. (R. at 637-72.) During this time, Dr. Van Zee did not prescribe anti-anxiety medication. (R. at 638-39, 641, 643, 645, 647, 650, 652, 654, 656, 658-59, 662, 664, 666-68, 670, 672.)

On November 18, 2014, Bishop reported that he was helping his father work on remodeling a house that he planned to move into. (R. at 665.) He again reported on January 27, 2015, that he and his father were still working on remodeling a house and that he was trying to get things moved into it. (R. at 657.) In May 2015, Bishop reported that he was working on a house and making plans to move. (R. at 644.) He had not followed through with psychological testing. (R. at 644.) Dr. Van Zee diagnosed nondependent tobacco use disorder; other mixed and unspecified drug abuse; opioid type dependence, unspecified; cirrhosis of the liver without mention of alcohol; and chronic hepatitis C. (R. at 646.) On December 31, 2015, Dr. Van Zee reported that Bishop was unable to work "at this time," but that Bishop's condition could improve within six months; therefore, he would re-evaluate Bishop in six months. (R. at 626.) He based this finding on Bishop's diagnoses of chronic hepatitis C; chronic liver disease; and dermatitis herpetiformis, a major chronic skin condition with generalized rash and severe itching. (R. at 626.)

The record shows that Bishop treated with Dr. Russell D. Mader, M.D., from March 2012 through October 2012 for dermatitis herpetiformis. (R. at 337-38, 611-20.) On March 19, 2012, Dr. Mader saw Bishop for complaints of widespread itchy

rash that had been present for two years. (R. at 338.) On July 11, 2012, Dr. Mader reported that Bishop appeared to be healthy, cooperative and alert. (R. at 617.) He showed signs consistent with dermatitis herpetiformis on the posterior calves, anterior shins, elbows, mid buttocks, gluteal crease and forehead. (R. at 617.) A skin biopsy was taken from Bishop's left elbow, which showed that Bishop suffered from dermatitis herpetiformis. (R. at 611, 617.) Bishop was prescribed medication and advised to follow a gluten-free diet. (R. at 617.) On October 2, 2012, Bishop reported that he was doing well and was having no major problems. (R. at 614.) He reported that the medication cleared the rash, but that he still had itching in his scalp. (R. at 615.) Dr. Mader recommended that Bishop continue to take Dapsone, and follow up with him in three months. (R. at 405.) Bishop failed to keep appointments with Dr. Mader in January 2013, February 2013, November 2013 and December 2013. (R. at 612-13.) As noted above, in April 2013, Bishop told Dr. Van Zee that his rash was "okay." ( R. at 372.)

On May 19, 2013, Dr. Kevin Blackwell, D.O., examined Bishop at the request of Disability Determination Services. (R. at 345-49.) Dr. Blackwell reported that Bishop was alert, cooperative and oriented with good mental status. (R. at 347.) Bishop's affect, thought content and general fund of knowledge appeared to be intact. (R. at 347.) A musculoskeletal examination revealed that Bishop's gait was symmetrical and balanced. (R. at 348.) There were no effusions or obvious deformities of the upper or lower joints. (R. at 348.) The upper and lower extremities were normal for size, shape, symmetry and strength. (R. at 348.) Grip strength was good at 5/5 and equal bilaterally, reflexes in the upper and lower extremities were good and equal bilaterally, a Romberg test was negative, and proprioception was intact. (R. at 348.) Dr. Blackwell diagnosed chronic low back pain; right sciatica; hypertension by history; and hepatitis by history. (R. at 348.) Dr. Blackwell opined that Bishop could occasionally lift items weighing up to 40

pounds and frequently lift items weighing up to 25 pounds. (R. at 348.) He opined that Bishop should be able to sit for eight hours in an eight-hour workday and stand for two hours in an eight-hour workday, assuming normal positional changes. (R. at 348.) Dr. Blackwell further opined that Bishop could not squat, crouch, crawl, work at unprotected heights or perform repetitive and continuous stair climbing. (R. at 348.) Dr. Blackwell opined that Bishop could perform above-head reaching activities one-third of the day with either arm, perform foot pedal operating one-third of the day with either foot and perform kneeling activities one-third of the day. (R. at 348.) He placed no limitations on hand usage, including fine motor movements and skill activities of the hands, and he imposed no vision, communication, hearing or environmental limitations. (R. at 348.)

On May 22, 2013, Dr. Carolina Bacani-Longa, M.D., a state agency physician, found that Bishop had the residual functional capacity to perform medium work. (R. at 84-85.) No postural, manipulative, visual or communicative limitations were noted. (R. at 84-85.) Dr. Bacani-Longa noted that there was insufficient evidence to show a disabling condition prior to Bishop's date last insured of September 30, 2012. (R. at 76.) Dr. Bacani-Longa noted that, although Bishop reported difficulties due to anxiety, panic and PTSD prior to his date last insured, the record did not show that Bishop had severe difficulties requiring emergency treatment. (R. at 78.) She also noted that, although Bishop reported difficulties due to hepatitis C and the sciatic nerve in his right leg, his records did not contain information as to whether these conditions limited his ability to participate in normal daily activities. (R. at 78.) Accordingly, Dr. Bacani-Longa found that Bishop's condition was not disabling on any date through September 30, 2012, when his insured status expired for the purposes of DIB. (R. at 78.)

On February 20, 2014, Dr. Jack Hutcheson, M.D., a state agency physician, found that Bishop had the residual functional capacity to perform medium work. (R. at 97-98.) No postural, manipulative, visual or communicative limitations were noted. (R. at 98.) Dr. Hutcheson also noted that there was insufficient evidence to evaluate the claim prior to Bishop's date last insured of September 30, 2012. (R. at 97.)

## III.  Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2017). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920.  If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2017).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner.  To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2011 & West 2012); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir.

1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

Bishop argues that the ALJ erred by improperly determining his residual functional capacity. (Memorandum In Support Of Plaintiff's Claim For Social Security, ("Plaintiff's Brief"), at 6-9.) In particular, Bishop argues that the ALJ erred by failing to give controlling weight to his treating physician, Dr. Van Zee. (Plaintiff's Brief at 7-10.) Bishop also argues that the ALJ failed to give appropriate credence to his allegations concerning his symptoms. (Plaintiff's Brief at 10-13.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided her decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§

404.1527(c), 416.927(c), if he sufficiently explains his rationale and if the record supports his findings.

Bishop argues that the ALJ erred by failing to give controlling weight to his treating physician, Dr. Van Zee, in determining his residual functional capacity. (Plaintiff's Brief at 6-10.) After a review of the evidence of record, I find Bishop's argument unpersuasive. The ALJ must consider objective medical facts and the opinions and diagnoses of both treating and examining medical professionals, which constitute a major part of the proof of disability cases. *See McLain v. Schweiker*, 715 F.2d at 869. The ALJ must generally give more weight to the opinion of a treating physician because that physician is often most able to provide "a detailed, longitudinal picture" of a claimant's alleged disability. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2017). However, "[c]ircuit precedent does not require that a treating physician's testimony 'be given controlling weight.'" *Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (quoting *Hunter v. Sullivan*, 993 F.2d 31, 35 (4th Cir. 1992) (per curiam)). In fact, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." *Craig*, 76 F.3d at 590.

Based on my review of the record, I find that substantial evidence exists to support the ALJ's decision to not give controlling weight to the opinions of Dr. Van Zee. The ALJ stated that he was giving Dr. Van Zee's opinions little weight because his mild findings upon examination and limited prescribed medications, as well as the mild or normal diagnostic findings in the record, and the lack of specialized mental health treatment were inconsistent with the severity of limitations Dr. Van Zee opined. (R. at 32-33.) On July 24, 2011, x-rays of Bishop's cervical spine showed mild spondylosis, and an x-ray of Bishop's thoracic spine showed nominal scoliosis and spondylosis. (R. at 443, 445.)

On May 22, 2012, Bishop reported that he had stopped working due to increased depression and leg pain, but stated that the main reason he stopped working was because of right leg pain. (R. at 428.) X-rays of Bishops right knee and lumbosacral spine were normal. (R. at 442.) On September 11, 2012, Dr. Van Zee noted that Bishop's depression had improved with medication. (R. at 435.) Bishop reported that he had not been able to find work. (R. at 435.) On November 20, 2012, Dr. Van Zee wrote a reference letter for Bishop for employment purposes. (R. at 421.) The record shows that throughout 2012 and 2013 Bishop routinely reported that he was searching for employment, while at the same time alleging that he was disabled. (R. at 358, 361, 364, 372, 399, 420, 433, 435, 597.) In addition, the record shows that throughout 2012 and 2013 Bishop reported that he was doing well and that his symptoms of anxiety and dermatitis herpetiformis had improved with medication. (R. at 358, 361, 420, 433, 435, 579, 587, 601, 604, 614-15.) "If a symptom can be reasonably controlled by medication or treatment, it is not disabling." *Gross v. Heckler,* 785 F.2d 1163, 1166 (4th Cir. 1986). On December 31, 2015, Dr. Van Zee reported that Bishop was unable to work "at this time," but that Bishop's condition could improve within six months; therefore, he would re-evaluate Bishop in six months. (R. at 626.) He based this finding on Bishop's diagnoses of chronic hepatitis C; chronic liver disease; and dermatitis herpetiformis. (R. at 626.) During this time, Dr. Van Zee did not prescribe anti-anxiety medication. (R. at 638-39, 641, 643, 645, 647, 650, 652, 654, 656, 658-59, 662, 664, 666-68, 670, 672.) The ALJ noted that the record reveals minimal mental health treatment, other than prescribed medications for opiate dependence. (R. at 28.) The ALJ also noted that the record did not indicate any significant back or lower extremity problems. (R. at 28.) The ALJ further considered Bishop's diagnosis of dermatitis herpetiformis, noting that this condition caused significant irritation for a while in 2012, but that it had been largely controlled since October 2012. (R. at 31, 405, 614.) *See Gross,* 785 F.2d at 1166.

The ALJ also considered the opinions of the state agency physicians who reviewed the record and found that Bishop was capable of performing the exertional demands of medium work. (R. at 31-32, 84-85, 97-98.) The ALJ also found, based on the evidence as a whole, that the record supported additional environmental limitations and a limitation regarding food preparation due to Bishop's diagnosis of hepatitis C. (R. at 32.) In addition, the ALJ considered the opinion of Dr. Blackwell and gave it little weight because it was inconsistent with his on examination report and the medical evidence of record. (R. at 32.) Dr. Blackwell noted that Bishop had normal range of motion of all joints, exhibited symmetrical and balanced gait, had full grip strength bilaterally and had normal size, shape, symmetry and strength of the bilateral upper and lower extremities. (R. at 32, 348.) Thus, Dr. Blackwell's relatively benign physical examination findings do not support the restrictive limitations he imposed on Bishop.

Bishop also argues that the ALJ failed to give appropriate credence to his allegations. (Plaintiff's Brief at 10-13.) Based on my review of the record, I find that the ALJ considered Bishop's allegations in accordance with the regulations. The Fourth Circuit has adopted a two-step process for determining whether a claimant is disabled by pain. First, there must be objective medical evidence of the existence of a medical impairment which could reasonably be expected to produce the actual amount and degree of pain alleged by the claimant. *See Craig*, 76 F.3d at 594. Second, the intensity and persistence of the claimant's pain must be evaluated, as well as the extent to which the pain affects the claimant's ability to work. *See Craig*, 76 F.3d at 595. Once the first step is met, the ALJ cannot dismiss the claimant's subjective complaints simply because objective evidence of the pain itself is lacking. *See Craig*, 76 F.3d at 595. This does not mean, however, that the

ALJ may not use objective medical evidence in evaluating the intensity and persistence of pain. In *Craig*, the court stated:

> Although a claimant's allegations about [his] pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges [he] suffers....

76 F.3d at 595.

I find that the ALJ reasonably found that Bishop's subjective complaints of disabling functional limitations were not entirely credible. (R. at 31.) The ALJ found that Bishop's allegations of significant sciatica in the right leg were inconsistent with the objective diagnostic evidence or ongoing treatment for back and leg pain. (R. at 31.) On July 24, 2011, x-rays of Bishop's cervical spine showed mild spondylosis, and an x-ray of Bishop's thoracic spine showed nominal scoliosis and spondylosis. (R. at 443, 445.) In May 2012, x-rays of Bishops right knee and lumbosacral spine were normal. (R. at 442.) Bishop alleged that his rash caused him to itch, bleed and scratch himself; however treatment notes indicate that, while dermatitis herpetiformis caused significant irritation for a while in 2012, his rash had been largely controlled since October 2012. (R. at 31, 405, 614.) Bishop alleged that he could not work around other people due to anxiety, but the record fails to show that he received any significant treatment for an anxiety disorder. (R. at 31.) The ALJ noted that Bishop's poor work history and ongoing marijuana use, despite the recommendation of Dr. Van Zee to cease use, do not augment his credibility. (R. at 31.) Furthermore, Bishop reported looking for work throughout 2012 and 2013 and reported doing home repairs with his father in 2014 and 2015. (R. at 31, 644, 657, 665.) Based on this, I

find that the ALJ reasonably found that Bishop's subjective complaints of disabling functional limitations were not credible.

Based on the above-stated reasons, I find that the substantial evidence supports the Commissioner's decision that Bishop was not disabled. An appropriate Order and Judgment will be entered.

DATED:     December 14, 2017.

/s/  *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE